UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,     )   CRIM. NO. 04-30046-MAP
                              )
          vs.                 )
                              )
ALBERT INNARELLI, ET AL.,     )
                              )
                    Defendants. )

GOVERNMENT'S STATEMENT OF FACTS FOR PLEA COLLOQUY

The United States of America, by and through Michael J. Sullivan, United States Attorney for the District of Massachusetts, and William M. Welch II, Assistant United States Attorney, hereby files this statement of facts for purposes of the plea colloquies scheduled for May 4, 2006.

I. **Background**

From approximately 1995 through 2003, a group of individuals became involved in a land-flipping scheme in the greater Springfield area. In summary, several individuals, hereinafter termed "land-flippers", worked with a network of mortgage brokers, appraisers and lawyers who conspired to obtain fraudulent loans based upon the submission of false loan documentation and inflated appraisals.

The land-flipping scheme worked in the following manner. The land-flippers purchased distressed properties, mostly at

1

auction, at reduced prices because of the many repairs that these properties needed to be habitable.  Many of these properties had numerous code violations; some were condemned.  The land-flippers employed "runners" who referred prospective first-time homebuyers to the land-flippers.

To induce the buyers to buy, the land-flippers told the prospective buyers that they did not have to make a down payment on the real estate purchase even though the lending institutions required down payments.  In addition, the land-flippers informed the buyers that they did not have to worry about bad credit or low income.  As a further inducement, the land-flippers promised to make certain repairs to the homes or promised money back under the table at the closing.

The land-flippers then assisted the buyers in obtaining financing for these properties.  The "land-flippers" referred the prospective buyers to mortgage brokers who were involved in the scheme.  The "land-flippers" and the mortgage brokers generated false documentation on behalf of these buyers.  The false documentation induced the mortgage lenders into believing that the buyers qualified for mortgages that they would not have legitimately received.  This false documentation included false down payment information, false asset information, false rental verification information, and false employment and wage information such as bogus W-2s.

2

There were three scenarios by which the land-flippers and mortgage brokers generated false information regarding down payments.  The first involved the prospective buyer's sale of a fictitious car to a fictitious individual.  The land-flippers and the mortgage brokers generated a false bill of sale, an altered registration, and an altered cashier's check.  As an example, the land-flippers and the mortgage brokers would purchase a legitimate cashier's check for $100.00, white out the $100.00 and type in $5,000.00, and then include a copy of the altered cashier's check in the loan package as proof of the prospective buyer's receipt of funds for the down payment and the false vehicle sale information as proof of the source of funds for the down payment.

The second scenario required the land-flipper to accompany the prospective buyer to the bank.  The land-flipper would give the prospective buyer $5,000.00 in cash and have the prospective buyer deposit the cash into his or her bank account.  The buyer then had the bank issue a cashier's check to the buyer, who in turn endorsed the cashier's check back to the land-flipper.  A copy of the face of the cashier's check was included in the loan package as proof of the prospective buyer's source of funds for the alleged down payment.

The third scenario involved a prospective buyer who did not have a bank account.  In that situation, the land flipper and the

mortgage brokers simply altered a legitimate cashier's check and included a copy of the altered cashier's check in the loan package as proof of the prospective buyer's down payment. Sometimes, the prospective buyer's name was added to someone else's bank account to make it look like the prospective buyer had the funds for a down payment.

Many of the lending institutions also required a year's worth of rental receipts as proof of a prospective buyer's stability and financial wherewithal to assume the responsibility of monthly mortgage payments. The land-flippers and mortgage brokers created false money orders and rental verification forms to make it look like a prospective buyer had been making regular monthly rental payments for a year. The corrupt mortgage brokers received a hidden ownership interest in the underlying real estate transaction or a bribe as payment for engaging in this fraudulent conduct.

The land flippers then used appraisers who generated fraudulent appraisals. These appraisers prepared false appraisal reports that artificially inflated the values of these properties to give the mortgage lender the impression that the properties had a higher value. The appraisers sometimes would not enter the homes when doing their appraisals. Many of the homes had obvious, visual defects such as no boilers, no plumbing systems, and extensive interior damage. On other occasions, the

4

appraisers valued the properties as if substantial renovations had been made to the property when in fact no such renovations had been made at the time of appraisal.

The land-flippers, mortgage brokers, and appraisers also routinely used false second mortgages between the sellers and buyers as part of the scheme. The purpose of the second mortgage was to cover the difference between the down payment, the amount that the lender was willing to lend, and the purchase price. Most lenders only lent 80% or 90% of the purchase price, but required a 5% or 10% down payment. The fraudulent second mortgages made up that difference. The second mortgage was fraudulent because the sellers never intended to collect upon the second mortgage. The fraudulent second mortgage, in conjunction with the fraudulent down payment, transformed the loan into a 100% financing, which the lenders would have rejected if they had known about the true underlying facts.

Attorney Albert Innarelli handled the closings for virtually all of the flipped properties. Innarelli prepared and signed off on all of the closing documents, many of which contained false information, and prepared false title information that indicated that the land-flippers had held title to these properties for a longer period than was true. Many of the lending institutions had a "seasoning" requirement, which meant that the loan company would not loan any money for a property that had been held by a

seller for less than one year.  Innarelli certified to the lending institutions that the land-flippers held the properties for more than a year.  Since Innarelli represented the lending institutions, the lending institutions accepted Innarelli's representations at face value.

Innarelli typically represented the land-flippers in their initial purchase of the property.  Innarelli typically did not record the deed documenting the land-flippers' purchase of a property until after their subsequent re-sale of the property, thereby concealing the rapid purchase and re-sale of the property from the public and the lending institutions.

Innarelli also received "incentive" payments to rush a closing or for particularly problematic (i.e. really fraudulent) closings.  In addition, Innarelli also became partners on some deals with the land-flippers.  Innarelli never disclosed his hidden interests to the lending institutions or the prospective buyers.

The land-flippers usually attended the closings because everyone wanted to make sure to receive their cut from the property deal.  Upon receipt of the loan proceeds via wire from outside the Commonwealth of Massachusetts into his IOLTA account, Innarelli issued checks to the various participants in the underlying real estate transaction.  Innarelli often issued checks greater than $10,000.00 to pay off the underlying

6

mortgages from the initial purchase of the property by the land flipper and to disburse the profits to the land flippers for a particular deal.  Innarelli prepared HUD-1 closing statements that never disclosed the checks issued to hidden partners.

## II. **Michael Bergdoll**

Various cooperating witnesses, victim-buyers and third party documentation would have proven that Michael Bergdoll was one of the land-flippers.  These witnesses and the documents would have established that Bergdoll was fully knowledgeable of all aspects of the scheme to defraud.

### A. **Count Five**

Regarding Count Five, the Government would have established that, according to records with the Hampden County Registry of Deeds, Bergdoll purchased 70-72 Alderman on September 24, 1999 for $51,000.00 and sold the property on September 24, 1999 for $90,000.00.  The victim-buyer obtained a loan of approximately $74,000.00 from Equicredit, which wired the loan proceeds from outside the Commonwealth of Massachusetts into Attorney Innarelli's IOLTA account.  Equicredit had a one year seasoning requirement.

According to the victim-buyer, she met James Smith from Springfield Mortgage, who showed the victim-buyer 70-72 Alderman. The victim-buyer knew that the house had electrical problems, bad plumbing and a porch that needed to be fixed, but Smith told the

7

victim-buyer that all of the repairs would be made before the closing.

The victim-buyer stated that she never put $4,500.00 down to purchase the house.  When shown a HUD Settlement Statement indicating that she had put down $4,500.00, the victim-buyer stated that information was false.  When shown a second mortgage in the amount of $13,500.00, the victim-buyer stated that she never obtained a second mortgage, had no idea about a second mortgage, and never made payments on a second mortgage.

The victim-buyer attended the closing along with Innarelli and Bergdoll.  The victim-buyer understood Bergdoll to be the owner of the home.  At the closing, Bergdoll received two IOLTA checks, each in the amount of $8,276.61, and one check in the amount of $50,000.00.

After buying 70-72 Alderman, the victim-buyer realized that none of the promised repairs had been made.  The victim-buyer tried to reach Bergdoll to make the repairs, but was unable to contact him.  Equicredit foreclosed upon the victim-buyer in December, 2003.

### B. Count Twenty-Nine

Regarding Count Twenty-Nine, the Government would have established that, according to records with the Hampden County Registry of Deeds, 34 Cambridge Street was purchased January 20, 2000 for $20,000.00 and was sold on June 6, 2000 for $70,000.00.

8

The victim-buyer obtained a loan of approximately $63,000.00 from Equicredit, which wired the loan proceeds from outside the Commonwealth of Massachusetts into Attorney Innarelli's IOLTA account. Equicredit had a one year seasoning requirement.

According to the victim-buyer, he bought the house from Bergdoll. Bergdoll told the victim-buyer that he needed a bank account to buy the house and took the victim-buyer to Bank of Western Massachusetts where Bergdoll listed the victim-buyer on a bank account as a co-applicant. The victim-buyer stated that the balance was $20,000.00, but that he never had access to the money. Bank of Western Massachusetts later produced records showing that this bank account originally had been opened in the name of one of Bergdoll's corporate entities.

The victim-buyer stated that he never put $7,000.00 down to purchase the house because he did not have the money. When shown a HUD Settlement Statement indicating that he had put down $7,000.00, the victim-buyer stated that the information was false.

The victim-buyer attended the closing along with Innarelli and Bergdoll. The victim-buyer understood Bergdoll to be the owner of the home. At the closing, the victim-buyer received back $3,000.00, which was not listed on the HUD Settlement Statement. Bergdoll received one IOLTA check in the amount of $20,740.00.

9

The victim-buyer stated that 34 Cambridge had broken windows, broken doors, a leaky roof, and had grass growing inside of the residence.  Equicredit foreclosed upon the victim-buyer in July, 2001.

### C. **Count Forty-Three**

Regarding Count Forty-Three, the Government would have established that, according to records with the Hampden County Registry of Deeds, Bergdoll purchased 62-64 Alderman Street on July 24, 2000 for $50,000.00 and sold it on October 30, 2000 for $80,000.00.  The victim-buyer obtained a loan of approximately $72,000.00 from Equicredit, which wired the loan proceeds from outside the Commonwealth of Massachusetts into Attorney Innarelli's IOLTA account.  Equicredit had a one year seasoning requirement.

According to the victim-buyer, he bought the house from Bergdoll.  Bergdoll referred the victim-buyer to Trinity Mortgage, whose representative told the victim-buyer that he did not have to put any money down on the purchase.  The loan file contained a verification of deposit form that stated that the victim-buyer had $5,000.00 of available funds at Hampden Savings. Bank of Western Massachusetts later produced records showing that this bank account actually belonged to one of Bergdoll's corporate entities.

The victim-buyer stated that he never put any money down to

10

purchase the house because he did not have the money.  Equicredit required 5% down, or $4,000.00.  The victim-buyer also stated that he had no idea about a $4,000.00 second mortgage on the property.  The victim-buyer never made any payments to Bergdoll, nor did Bergdoll try to collect.

The victim-buyer attended the closing along with Innarelli, Bergdoll and Marc Brown, the Trinity Mortgage mortgage broker. The victim-buyer understood Bergdoll to be the owner of the home. Bergdoll received two IOLTA checks, one in the amount of $20,000.00 and the second in the amount of $46,000.00.

### III. **Anthony Matos**

Various cooperating witnesses, victim-buyers and third party documentation would have proven that Anthony Matos was one of the land-flippers.  These witnesses and the documents would have established that Matos was fully knowledgeable of all aspects of the scheme to defraud.

### A. **Count Twelve**

Regarding Count Twelve, the Government would have established that, according to records with the Hampden County Registry of Deeds, Matos purchased 241 Oak Street on December 8, 1999 for $60,000.00 and sold the property on December 10, 1999 for $110,000.00.  The victim-buyer obtained a loan of approximately $99,000.00 from Accubanc, which wired the loan proceeds from outside the Commonwealth of Massachusetts into

Attorney Innarelli's IOLTA account.  National City Mortgage later assumed the mortgage.

According to the victim-buyer, an ex-boyfriend referred her to Matos.  Matos showed her 241 Oak Street and then referred the victim-buyer to Paul Starnes and Trinity Mortgage, where Starnes handled her loan application.  The victim-buyer stated that she had a meeting with both Starnes and Matos at Trinity Mortgage where she told both of them that she did not have the money for a down payment, and that she had bad credit.  Starnes and Matos told the victim-buyer not to worry because they had ways of working around those issues.

Starnes and Matos told the victim-buyer that she needed to fill out a gift letter from a relative, and they provided a copy of a form gift letter to the victim-buyer.  The victim-buyer told both Starnes and Matos that she did not have a relative who had the money for a down payment, and that she did not feel comfortable signing the gift letter.  Matos re-assured the victim-buyer that she should not worry, that it was normal operating procedure to use such letters, and that no one would find out.  The victim-buyer agreed to use the gift letter because she really wanted a house.  In late November, 1999, Joseph Sullivan performed the appraisal and valued 241 Oak Street at $110,000.00.

A review of the 241 Oak loan file revealed a gift letter for

$5,500.00.  The victim-buyer stated that this gift letter was false, and that both Starnes and Matos knew the letter was false. The loan file also contained a $5,500.00 cashier's check as evidence of the down payment.  The victim-buyer stated that this check was false because she never put any money down on this property.  The loan application stated that the victim-buyer had household goods of $110,000.00.  The victim-buyer stated that this information was false.

As a result of these false statements, Accubanc Mortgage approved the loan and wired approximately $99,000.00 from outside the Commonwealth of Massachusetts into Attorney Innarelli's IOLTA account on or about December 13, 1999.  Matos received four IOLTA checks for 241 Oak:  one for $5,000.00, another for $12,691.36, a third for $11,750.00, and a final one for $19,800.00.  The memo section for the $5,000.00 check stated, "Re: 241 Oak Street/Paul Starns."  Starnes later admitted that he received $5,000.00 from Matos to process this fraudulent loan.

When National City Mortgage assumed the mortgage, an independent appraiser conducted a second appraisal and valued the property at $48,000.00 in July, 2000, only six months after Sullivan had appraised the property at $110,000.00.  National City foreclosed upon the victim-buyer in November, 2000 because she could not afford to make the payments.

**B. <u>Count Fifty-Two</u>**

Regarding Count Fifty-Two, the Government would have established that, according to records with the Hampden County Registry of Deeds, Matos bought 2-4 St. Jerome Street on December 12, 2000 for $30,222.00 and sold it on March 13, 2001 for $99,000.00. The victim-buyer obtained a loan of approximately $97,000.00 from Countrywide, which wired the loan proceeds from outside the Commonwealth of Massachusetts into Attorney Innarelli's IOLTA account.

According to the victim-buyer, he bought the house from Matos. The victim-buyer worked as courier at Matos' used automobile business, Elite Auto Center. Matos told the victim-buyer that he could make a lot of money buying and selling real estate and promised him money back at the closing.

A review of the victim-buyer's loan file contained two W-2s for approximately $32,000.00 for the years 1999 and 2000 from Elite Auto Center. The victim-buyer stated that he never made that much money, and that the W-2s were false.

The loan file also contained a gift letter for $3,300.00 and a copy of a cashier's check for $3,300.00. The victim-buyer stated that both items were false. In fact, Matos had provided $3,300.00 in cash to the victim-buyer and his girlfriend, who posed as the victim-buyer's sister and purchased the $3,300.00 cashier's check. The victim-buyer's girlfriend then gave the cashier's check back to the victim-buyer.

14

The victim-buyer attended the closing along with Innarelli and Matos.  At the closing, the victim-buyer received back an $8,000.00 IOLTA check, which was not listed on the HUD Settlement Statement.  Matos instructed the victim-buyer to cash the check and give approximately $4,000.00 in cash back to Matos.  The victim-buyer did as instructed.  Matos received two IOLTA checks, one for $28,300.00 and another for $1,000.00.  Countrywide Home Loans foreclosed upon the victim-buyer in December, 2002.

### C. **Count Sixty-Five**

Regarding Count Sixty-Five, the Government would have established that, according to records with the Hampden County Registry of Deeds, Matos purchased 130-132 Orange Street on July 30, 2001 for $55,000.00 and sold it on December 12, 2001 for $115,000.00.  The victim-buyer obtained a loan of approximately $113,000.00 from Countrywide, which wired the loan proceeds from outside the Commonwealth of Massachusetts into Attorney Innarelli's IOLTA account.

According to the victim-buyer, he bought the house from Matos.  Matos had used the victim-buyer as a general laborer and offered to sell 130-132 Orange Street to the victim-buyer.  The victim-buyer received Social Security disability payments and had no savings.

A review of the victim-buyer's loan file contained two W-2s for approximately $30,000.00 for the years 1999 and 2000 from

15

Capital One Construction.  The victim-buyer stated that he never worked for that company, and that the W-2s were false.  The loan application stated that he had a 1997 GMC van worth $12,000.00.  The victim-buyer stated that this information was also false, and that he had not driven since 1987.

The loan file also contained a gift letter for $3,800.00 and copy of cashier's check for $3,800.00 as evidence of the required down payment.  The victim-buyer stated that both items were false.  Matos actually provided $3,800.00 in cash to a third person, who, posing as the victim-buyer's brother-in-law, purchased the $3,800.00 cashier's check.  The third party then gave the cashier's check back to Matos.

Matos received an IOLTA check for $27,484.10 for 130-132 Orange Street.  Countrywide Home Loans foreclosed upon the victim-buyer in December, 2002.

### IV. **Pasquale Romeo**

Various cooperating witnesses, victim-buyers and third party documentation would have proven that Pasquale Romeo was one of the land-flippers.  These witnesses and the documents would have established that Romeo was fully knowledgeable of all aspects of the scheme to defraud.

### A. **Count Thirty**

Regarding Count Thirty, the Government would have established that, according to records with the Hampden County

Registry of Deeds, Romeo, in partnership with several other land flippers, purchased 30-32 Ozark on June 6, 2000 for $22,000.00 and sold the property on June 6, 2000 for $89,000.00. The victim-buyer obtained a loan of approximately $66,700.00 from Alliance Funding, which wired the loan proceeds from outside the Commonwealth of Massachusetts into Attorney Innarelli's IOLTA account.

According to the victim-buyer, he recently had been released from jail when Romeo approached the victim-buyer and told the victim-buyer that he could make a lot of money by buying and selling real estate. The victim-buyer told Romeo that he had no job and no money. Romeo told the victim-buyer that those facts were not a problem. Romeo also promised the victim-buyer money back at the closing.

The victim-buyer stated that he never put any money down to purchase the house. When shown a HUD Settlement Statement indicating that he had paid $23,000.00, the victim-buyer stated that information was false. The victim-buyer also knew that Romeo and others involved in the scheme had manufactured employment for him so that he could qualify for the loan.

The victim-buyer attended the closing along with Innarelli and others involved in the scheme. At the closing, Romeo received an IOLTA check in the amount of $18,657.00. The victim-buyer received an IOLTA check of $6,000.00, which was not

17

disclosed on the HUD.

According to the victim-buyer, 32-34 Ozark, which was a multi-family dwelling, had no plumbing or electrical systems on the second floor.  Neither one of the furnaces worked.  The victim-buyer was foreclosed upon in February, 2002.

### B. Count Thirty-Eight

Regarding Count Thirty-Eight, the Government would have established that, according to records with the Hampden County Registry of Deeds, Romeo, in partnership with several other land flippers, purchased 59-61 Avon Place on June 6, 2000 for $19,500.00 and sold the property on August 28, 2000 for $90,000.00.  The victim-buyer obtained a loan of approximately $67,000.00 from Option One, which wired the loan proceeds from outside the Commonwealth of Massachusetts into Attorney Innarelli's IOLTA account.

According to the victim-buyer, who was the same buyer of 32-34 Ozark, Romeo approached the victim-buyer about 59-61 Avon Place and told the victim-buyer that he would receive $35,000.00 back at the closing if he bought 59-61 Avon Place.  Romeo still knew that the victim-buyer had no income and no employment.

The victim-buyer stated that he never put any money down to purchase the house.  The victim-buyer also stated that Romeo and others involved in the scheme knew that the victim-buyer could not qualify for the loan, and, therefore, recommended that the

victim-buyer use his mother's credit and income figures to qualify for the loan and her name on the closing documents as a nominee.

According to the victim-buyer, the true owner of 59-61 Avon Place had died in late 1999 and the property had gone into foreclosure.  Therefore, to avoid the seasoning requirement, Innarelli never recorded Romeo and his partners' purchase of 59-61 Avon Place from the mortgage holder on June 6, 2000.  Instead, they forged the seller's signature on the closing documents so that it appeared as if the deceased owner, who had owned 59-61 Avon Place for a number of years, had sold the property directly to the victim-buyer's mother on August 28, 2000.

The victim-buyer attended the closing along with Innarelli and others involved in the scheme.  At the closing, Romeo's partners received IOLTA checks totaling $38,300.00.  The victim-buyer would have testified that Romeo received back a share of those profits.  Instead of receiving $35,000.00 at the closing, the victim-buyer only received $7,000.00, which was not disclosed on the HUD Settlement Statement.

After obtaining the keys for 59-61 Avon Place, the victim-buyer observed that one side of 59-61 Avon Place, which was a duplex, had a huge hole in the middle of the first and second floors caused by a fire.  There was no boiler, no operable plumbing or electrical systems, and no staircase.  The appraiser

was Joseph Sullivan, and the victim-buyer learned that Sullivan had received an extra $1,000.00 to $2,000.00 for the appraisal.

### C. Count Fifty-Nine

Regarding Count Fifty-Nine, the Government would have established that, according to records with the Hampden County Registry of Deeds, Romeo and co-defendant Mark McCarthy brokered the sale of 12-14 James Street to a co-defendant, Edgar Corona, on August 7, 2001 for $85,000.00.  12-14 James Street originally had been sold to an individual by the Grimaldis for $22,000.00 on April 19, 1999, but that individual was unable to make payments, declared bankruptcy, and deeded the property back to the Grimaldis on October 17, 2000.  Romeo then arranged the sale of the property to Corona, who obtained a loan of approximately $72,250.00 from Alliance Funding.  Alliance Funding wired the loan proceeds from outside the Commonwealth of Massachusetts into Attorney Innarelli's IOLTA account.

Romeo and McCarthy arranged for Corona's financing through Ivy Mortgage, McCarthy's employer.  Ivy Mortgage had no idea about McCarthy's involvement in the deal.  According to Corona, 12-14 James Street was in need of repair, and Romeo and McCarthy had agreed to give money back to Corona for repairs at the time of the closing.

At the closing, Romeo received an IOLTA check for $9,200.00 for his role in the transaction.  Corona received an IOLTA check

for $4,925.00.  McCarthy received two checks for $8,000.00 and $4,245.00, which McCarthy was supposed to endorse over to Corona. McCarthy, however, reneged on the deal and never gave the money back to Corona.  Ivy Mortgage received a broker fee of $1,445.00 and had no idea that McCarthy had secretly profited to the tune of $12,245.00.

Neither the check back to Corona nor the checks intended for repairs was ever disclosed on the HUD Settlement Statement.  12-14 James Street had been overvalued at the time of appraisal by virtue of its need for repairs.  Corona ultimately was foreclosed upon in November, 2004.

Filed this   4  th day of May, 2006.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


    /s/ William M. Welch II
WILLIAM M. WELCH II
Assistant United States Attorney

<u>CERTIFICATE OF SERVICE</u>

Hampden,  ss.                         Springfield, Massachusetts
                                      May 4, 2006


        I, William M. Welch, Assistant U.S. Attorney, do hereby
certify that I have served a copy of the foregoing by faxing and
electronically mailing said motion to:

Steven W. Leary, Esq.
95 State Street
Springfield, MA  01103

Vincent A. Bongiorni, Esq.         Michael O. Jennings, Esq.
95 State Street                    73 Chestnut Street
Springfield, MA  01103             Springfield, MA  01105



                              ___/s/ William M. Welch II_____
                              WILLIAM M. WELCH II
                              Assistant United States Attorney