UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 04-30046-MAP |
| | ) | |
| MICHAEL BERGDOLL, | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT MICHAEL BERGDOLL'S MOTION FOR A STATUTORY
SENTENCE AND MEMORANDUM IN SUPPORT**

## I.     INTRODUCTION

The Defendant, Michael Bergdoll, requests that this Court impose a statutory

sentence based on the following factors:  (1) the harm to the employees of his business if

he is incarcerated; (2) his health problem specifically, the fact that he suffers from

Chron's disease; (3) his history and characteristics, including that he cannot read or write

and that he has made extraordinary contributions to his community.  In addition, Bergdoll

requests that the Court disregard the Government's determination of loss because that

amount is overstated.

## II.     FACTUAL BACKGROUND

### A.     Personal And Family Background

Michael Bergdoll was born in Springfield, Massachusetts, the third of five

children.  His father, Frederick Bergdoll worked for the Bigelow Wire Company and the

Hampden County Sheriff's Department where he transported inmates.  His father died in

1996.  Bergdoll's mother is still living.  She was a teacher at the Hampden County House

of Correction.  Because his father was an alcoholic and spent most of his salary at the

local tavern, Bergdoll and his siblings began working at a young age to help their mother operate their home.  Bergdoll has done everything from delivering newspapers, mowing lawns and shoveling snow as a teenager to owning and operating his own construction business today.  As a result, Bergdoll has a strong work ethic and a strong sense of empathy for people in unfortunate circumstances.

Bergdoll is unable to read or write and has an IQ of 78 which places him in the borderline range of intelligence, above only 7% of his peers.  (See Report of Robin Berube, Certified School Psychologist, attached as Exhibit A).  Bergdoll's wife, Judy Bergdoll, has known him since they were in high school.  As she writes in her letter, school was very difficult for Bergdoll and he struggled academically, even with help from Judy, assistance of after school tutoring and special classes.  (See Letter of Judy Bergdoll attached as Exhibit B.)  In his sophomore year of high school, Bergdoll transferred to Putnam Vocational High School where he studied auto mechanics and from which he graduated in 1984.

Bergdoll's reading skills are below 99% of people his age - in other words he is illiterate.  (See Berube Report at Exhibit A).  Given his extraordinary lack of reading skills, sophisticated documents, such as those involved in the conduct to which he plead guilty, are well beyond his comprehension.    His inability to read and write has been a life-long embarrassment which he struggles to hide.  Bergdoll compensates by repeatedly reading words, trying to decode what he can and then filling in the blanks - more than likely making mistakes.  He only truly understands something if his wife Judy reads and interprets it for him. (See Judy Bergdoll's letter at Exhibit B).  In short, he has "faked it" for most of his life.

Bergdoll and his wife met in high school and have been married since 1989. As Judy Bergdoll describes their marriage, she and her husband have a true partnership, sharing equal responsibility for raising their children and running their respective businesses. The Bergdolls have two children, Michael Joseph Bergdoll who is 19 and works for Bergdoll Construction and Joseph Adam Bergdoll, who is 16 and a junior in high school. (See Letter of Judy Bergdoll at Exhibit B)

Bergdoll was diagnosed with arthritis in his lower back five years ago. In addition, he suffers from Crohn's disease, a disorder of the lower intestine. Initially, Bergdoll was prescribed medication to address the symptoms of Crohn's disease. However, the side effects of the medicine were intolerable. Therefore, he controls the disease with a strictly modified diet that eliminates all dairy products and reduces food with high acid content (such as citrus fruits, etc.) When Bergdoll was first diagnosed, he spent six months bed ridden and lost 60 pounds. (See Exhibit B) If he does not strictly control his diet, the painful symptoms of Crohn's disease reoccur. (See Letter from Judy Bergdoll at Exhibit B)

B.    **Bergdoll's Business**

Bergdoll owns and operates Bergdoll Construction which he founded in the early 1990's. Initially, Bergdoll Construction purchased homes that required renovations, made the renovations and either rented the property or sold it. In addition, Bergdoll Construction built new homes in the Springfield area and was one of a limited number of contractors that laid sewer and water pipe for the City of Springfield. Bergdoll's integrity as a businessman is respected by his suppliers, insurance agents, real estate agents, bankers and attorney. (See letters from lawyers, mortgage brokers, real estate agents,

bankers and insurance agents at Exhibit C; See letters from suppliers and competitors at

Exhibit D)  In addition, homebuyers, mortgage brokers and real estate brokers write

about the high quality of Bergdoll's homes.  (See letters at Exhibits C and D)  Through

his rehabilitation of dilapidated properties, Mike Bergdoll has been a significant factor in

the revitalization of the Indian Orchard section of Springfield.  (See Letter of Anthony

Diaz at Exhibit D)

Presently Bergdoll Construction is building new homes in the Springfield area.

Bergdoll Construction regularly relies on the services of over 50 people as painters,

carpenters and drywallers.  (See Judy Bergdoll's letter at Exhibit B and letters from

contractors employed by Bergdoll at Exhibit E)  If Bergdoll is sentenced to prison,

Bergdoll Construction will no longer operate and the many people who depend upon that

company for their livelihood will be out of work.  (See Letter of Thomas Breault,  Mark

DiFranco and Ted Tabin at Exhibit D and Exhibit E)

C.    **Contributions to the Community**

Bergdoll's dedication and commitment to his community is staggering and is a

much more accurate reflection of his character than the conduct that brings him before

this Court.  (Letters describing Bergdoll's community service are attached at Exhibit H)

His community service is not limited to the holiday season, nor is it limited to donating

the occasional canned goods to a food pantry or winter coat to a coat drive.  Community

service is part of the fabric of Mike Bergdoll's life and it is apparent that the poor and

underprivileged in Springfield have benefited from his generous spirit.  In fact, several of

the homeless people who have been helped by Bergdoll provided letters to the Court (See

Exhibit F)  Bergdoll works with people on the fringe, recognizing that he might not

- 4 -

change their circumstances permanently, but working to provide them with comfort and

dignity. Rafael Matos describes Bergdoll's contributions:

> Mike helped me out when I was homeless, and also help
> me get my on apt. He would check up on me, see if i was
> ok.  With food colothing and if i needed a Ride or if i
> needed to go to the Doc. Or any apoitment.  He would help
> me out with wath ever i needed.  This is a man who care's
> about people and dided what ever he could do for me.
> I think very mightly of this man.  He is a man who reaily
> cares about me and other's.
> (See Letter of Rafael Matos at Exhibit F)

Another homeless man, Malas Legenrand writes that Bergdoll has helped the homeless at

his own expense, "not for the glory but from the heart".  (See Letter of Malas Legenrand

at Exhibit F).  Finally, Gary Lukas writes that Bergdoll has helped "beyond the call of

duty".  (Letter of Gary Lukas at Exhibit F)

Bergdoll works with a youth group in the Indian Orchard section of Springfield

called the Lion's Den.  The Lion's Den is operated by the Reverend Gregory Dyson.

Dyson and Bergdoll grew up together in Springfield, but until several years ago, had not

seen each other for some time.    The Lions Den is a community center for at risk young

children and teens in Springfield.  It provides a safe, warm environment for the children

to go to after school and during the evening.  (See the Homepage from the Lion's Den

website attached at Exhibit G)  Most of the children serviced by the program have parents

with serious drug addictions and/or who are in jail.  Every week, Bergdoll purchases

food, at his own expense, and delivers it to the Lion's Den for snacks and meals.  Without

this significant contribution, the Lions Den would not be able to feed the many children

that it helps each week.  (See Letters of Pastor Gregory Dyson at Exhibit H and Judy

Bergdoll at Exhibit B)

In addition to the Lion's Den, Bergdoll goes out several nights a week in the cold weather to give blankets and warm clothing to homeless men and woman who will not leave the streets for the warmth of a shelter.  Michael purchases much of the clothing and blankets using his own money.  (See Letters of Judy Bergdoll at Exhibit B; E. Taylor Newton at Exhibit H)

Bergdoll provides significant assistance to a soup kitchen operated by Pastor Ruth Santiago at the Alfa Y Omega Church.  (See Letter from Ruth Santiago at Exhibit H) The relationship between Mike and Judy Bergdoll and Pastor Santiago began several years ago when Santiago contacted the Bergdolls at the suggestion of a friend of a friend. (See Judy Bergdoll's Letter at Exhibit B and Ruth Santiago's Letter at Exhibit H) Santiago explained that a benefactor gave the soup kitchen a house out of which it could operate.  Because the house had been badly damaged in a fire, it had to be demolished, but the church did not have the funds to pay for the demolition.  Santiago explained that their mutual friend told her that "Mike Bergdoll helps people in need".  True to form, Bergdoll provided all of the demolition services without any charge to the church or the soup kitchen and he hauled the debris to the City of Springfield dump, where the City permitted the debris to be dumped without charge.

Santiago's soup kitchen has applied for a grant that it intends to use to build an additional facility.  Bergdoll has agreed to build the facility at a cost that will allow the soup kitchen to set aside enough of the grant money to purchase appliances for the new kitchen.  The cost of the project will not include any profit for Bergdoll Construction and likely will cause Bergdoll Construction to incur expenses for which it will not be reimbursed.  Bergdoll will provide the services willingly simply because there are people

- 6 -

in need and he has the ability to help.  In addition to the Lion's Den and the Alfa Y

Omega soup kitchen, Bergdoll and his family cook breakfast once a month at the

Warming Place, a homeless shelter in Springfield, organize community events such as an

annual fishing festival and an annual dinner at a senior center, donate regularly to the

Disabled American Veterans Association and Volunteered at their sons' schools.  (See

letter of Judy Bergdoll at Exhibit B; letter of Yolanda Nahorniak at Exhibit H )

Bergdoll's kindness is not limited to those who are most obviously in need, such

as the homeless and the children at the Lion's Den.  He lends support, in large and small

ways, to anyone he knows who happens to be in need.  For example, he purchases

Christmas trees for everyone who works for Bergdoll Construction (See letter of Amanda

Lamb at Exhibit I, ), he finds employment for people who need a job (See letter Alex

Larossa at Exhibit E), and buys food for a struggling single mother (See letter of Amanda

Lamb).

Bergdoll's generous spirit directly helps the men, women and children who need

food and shelter and indirectly benefits the entire community.  Bergdoll understands the

importance of thinking beyond himself to focus on the community as a whole,

particularly on those who cannot help themselves.

### III.    ARGUMENT

**A.    The Sentencing Framework Following United States V. Booker**

As a result of the United States Supreme Court's decision in United States v.

Booker, the guidelines sentencing range is advisory.  United States v. Booker, 125 S.Ct.

738; 160 L.Ed.2d 621, 651 (2005).  Booker gives renewed significance to the Section

3553(a) mandate requiring that the sentence imposed be "sufficient, but not greater than

necessary" to comply with the purposes of sentencing -- retribution, deterrence,
incarceration and rehabilitation.  18 U.S.C. section 3553(a); United States v. Booker,
supra.   Moreover, when considering a term of imprisonment, the district court must
recognize the statutory admonition  that "imprisonment is not an appropriate means of
promoting correction and rehabilitation".  18 U.S.C. Section 3582(a).

Following Booker, to determine a sentence that is minimally sufficient to
accomplishment the goals of sentencing, the district court first calculates the applicable
advisory guidelines range.  Then, the court considers the remaining statutory factors and
can "tailor" its sentence based on application of those factors to the particular defendant.
Booker, 125 S.Ct. at 757; United States v. Jaber, 362 F.Supp. 2d 365, 367 (D.Mass.
2005).  Thus, the Booker decision restored some discretion to the district court at
sentencing.  Factors that could not be considered prior to Booker, can now be considered
by the sentencing court.  See United States v. Gorsuch, 404 F.3d 543 (1st Cir. 2005)
(recognizing that factors that were not relevant under the mandatory sentencing regime
are now relevant post-Booker); United States v. Pimental, 367 F.Supp.3d 143, 152
(D.Mass. 2005) (describing the post-Booker sentencing as a "hybrid regime--neither
purely discretionary nor mandatory guidelines"); United States v. Jaber, 362 F.Supp. 2d
365, 376 (D. Mass. 2005) ("Booker plainly allows courts to look carefully at [previously
discouraged or prohibited] factors and to determine to what degree they are relevant to
individual cases").  As one district court wrote, Booker is not "an invitation" to
"unmoored decision making, but to the type of careful analysis of the evidence that
*should* be considered when depriving a person of his or her liberty." United States v.
Myers, 353 F.Supp. 2d 1026 (S.D.Iowa 2005) (emphasis in original).

The statutory factors that must be considered at sentencing are: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the relationship between the sentence and the seriousness of the offense; (4) the need for the sentence to  deter adequately criminal conduct; (5) the need for the sentence to protect the public from further crimes of this defendant; (6) the need to provide the defendant with proper education, vocational training, medical care and other treatment in the most effective manner; (7) the kinds of sentences available; (8) the advisory guideline range; (9) relevant policy statements in the Sentencing Guidelines; (10) the need to avoid unwarranted sentencing disparities; and (11) restitution to the victim.  18 U.S.C. §3553(a)[1]; United States v. Booker, supra.

---

[1] § Section 3553(a) provides as follows:

"Factors to be considered in imposing a sentence. -- The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider --(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed--(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for--(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--(i)issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28; and (ii) that, except as provided in section 3742(g) are in effect on the date the defendant is sentenced; or (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); (5) any pertinent policy statement--(A) issued by the Sentencing Commission pursuant to § 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission under § 994(p)of title (28); and (3) that, except as provided in § 3742(g), is in effect on the date the defendant is sentenced (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of any offence."

Thus, following <u>Booker</u>, the guidelines calculation is just one of many factors to be considered by the court when deciding a defendant's sentence. The First Circuit has not decided what weight the sentencing court should give to the advisory guidelines range, as compared to the other statutory factors. At least one district court within the First Circuit has held that the analysis of the statutory factors should be permitted to evolve and that one factor (i.e. the guidelines range) should not be given more weight than the others. <u>United States v. Jaber</u>, 362 F.Supp.2d at 367. (recognizing that giving "heavy" weight to the advisory guideline calculation "comes perilously close to the mandatory regime found to be constitutionally infirm in <u>Booker</u>").

After considering the § 3553(a) factors, the sentencing court then must decide whether to sentence the defendant within the advisory guidelines range or determine if a non-guidelines sentence, i.e., one that is below the advisory guidelines range, should be given. The following section reviews the §3553(a) factors to establish that sentencing Bergdoll below the advisory guideline range is reasonable.

**B.    <u>Determining The Sentence --- The 3553(a) Factors</u>**

**1.    <u>The Nature and Circumstances of the Offense</u>**

Bergdoll plead guilty to counts Five, Twenty-Nine and Forty-three of the Superseding Indictment, charging him with wire fraud, and Count Sixty-Nine charging him with conspiracy to commit money laundering. The charges arose out of a scheme to flip real estate for a profit. Bergdoll is charged with having participated in transactions relating to 22 properties (including those in the substantive counts to which he plead guilty). (See Counts 1, 2, 5, 9, 10, 13, 17, 21, 23, 27, 29, 30, 31, 32, 34, 39, 43, 45, 49, 50, 51 and 57). In determining the appropriate sentence, several factors are important.

(a) <u>Bergdoll Could Not Have Been a Mastermind of This Scheme</u>

Contrary to the statements of Bergdoll's co-defendants', Bergdoll could not have

been a mastermind of this scheme, nor could he have participated in the drafting of

documents.  As set forth in the report at Exhibit A, Bergdoll is of borderline intelligence

and can barely read or write.  This is not the profile of a man who is the organizer of a

sophisticated financial scheme involving the altering of documents and the structuring of

financial transactions.

(b) <u>Bergdoll Did Not Necessarily Retain Funds Received from Innarell's
IOLTA  Account</u>

The Government's version of the offense, which appears to form the basis for the

PSR, represents that Bergdoll received checks from Albert Innarelli's IOLTA account in

connection with some of the transactions that form the basis for the Superseding

Indictment.  It is not clear that Bergdoll retained all of the funds received.  By way of

example, Bergdoll is alleged to have received a check in the amount of $78,358.59

following the sale of 22 Burr Street.  (See PSR at paragraph 242).  Bergdoll received a

check in that amount and then proceeded to purchase bank checks to distribute the

proceeds as follows:

| | |
|---|---|
| George Petropolous | $25,95602 |
| Michael Bergdoll | $22,935.61 |
| Albert Innarelli | $18,880.96 |
| Natividad Agueda | $ 5,000 |
| Joe Sullivan | $ 3,000 |
| Padro Matos | $ 2,000 |
| Scatolini Insurance | $   565.00 |
| Total | $78,336.98 |

(Copies of the front and back of the checks are attached as Exhibit W)  The balance

represents the fee for purchasing the bank checks.  Thus, in this example it is clear that

Bergdoll did not retain the total amount of the IOLTA check made payable to him. With additional time, Bergdoll may be able to make a similar showing with respect to other transactions.

     (c) Property Bergdoll Did Not Own or Sell

     Bergdoll did not own or sell 9 of the 22 properties with which he was charged. As a result, the amount of the loss attributed to those properties should be deducted from the overall loss calculation used to determine Bergdoll's sentence. The following is a review of those properties, including references to deeds and corporate records to support Bergdoll's assertions. The number in parentheses following the address is the amount to be deducted from the overall loss calculation. The total amount to be deducted based on property that Bergdoll did not own is $377,749.

> i. 111 King Street (Count 9) ($44,525) This property was owned and sold by New England Wholesalers of Holyoke. New England Wholesalers of Holyoke was neither owned, operated nor controlled by Bergdoll. Attached as Exhibit J is the deed relating to the sale of 111 King Street and the corporate filings reflecting the ownership of New England Wholesalers of Holyoke.

> ii. 21 Marble Street (Count 17) ($32,375) This property was owned and sold by Leroy's Management Services, Inc. Leroy's Management Services was neither owned, operated nor controlled by Bergdoll. Attached as Exhibit K is the deed relating to the sale of 21 Marble Street and the corporate filings reflecting ownership of Leroy's Management Services, Inc.

> iii. 189 Bay Street (Count 21)($21,750). This property was owned and sold by W.R. Associates an entity controlled by Roger Kum. Attached as Exhibit L is the HUD form relating to the sale of 189 Bay Street.

> iv. 34 Cambridge Street (Count 29) (No amount deducted) This property also was owned and sold by Leroy's Management Services, Inc. Attached as Exhibit M is the deed relating to the sale of 34 Cambridge Street and the corporate filings reflecting ownership of Leroy's Management Services, Inc.

v. 32-34 Ozark Street (Count 30) (No amount deducted) This property was owned and sold by Jamie Murty. Attached as Exhibit N is the deed relating to the sale of 32-34 Ozark Street.

vi. 100-104 Greene Street (Count 39) ($45,500): This property was owned and sold by Fredricton, an entity owned and controlled by Marc Brown.

vii. 62 Sycamore Street (Count 45) ($77,900): This property was owned and sold by Pasquale Romeo. Attached as Exhibit O is the deed reflecting the sale referenced in the Superseding Indictment.

viii. 50 Church Street, Westfield (Count 49) ($92,699) This property was owned and sold by Casa Marketing. Casa Marketing is neither owned nor controlled by Bergdoll. Attached as Exhibit P is the deed relating to the sale of 50 Church Street and the corporate filings reflecting ownership of Casa Marketing.

ix. 154 Oak Grove Street (Count 51) ($63,000) This property was owned and sold by Angelo Petropolous not Bergdoll. Attached as Exhibit Q is a copy of the relevant deed reflecting Petropolous' ownership.

(d) Renovations Performed by Bergdoll

Contrary to the statements of his co-defendants, Bergdoll did renovate some of the properties that he sold. Of the properties referenced in the substantive counts in the Superseding Indictment and which reference Bergdoll, Bergdoll performed renovations on at least six of the properties in a total amount of $21,987.15 plus labor. The following is a breakdown of the renovations that Bergdoll performed[2]

i. 28-30 Bay Street (Count 1): Bergdoll performed renovations totaling at least $3,466.77, plus labor. (Receipts supporting this figure are attached as Exhibit R)

ii. 70-72 Alderman Street (Count 5): Bergdoll performed renovations totaling at least $3,217.32, plus labor. (Receipts supporting this figure are attached as Exhibit S.)

---

[2] The amount of repairs is based solely on receipts reviewed and copied from documents that were seized by the government during the investigation of this case. Because of the significant amount of documents that Bergdoll and his wife had to review to compile this information, the information they collected may not be complete. Thus, Bergdoll may have performed additional renovation work that his not accounted for here. Moreover, the dollar figure set forth for renovation does not include the significant amount that Bergdoll paid for labor or performed himself.
.

      iii. <u>89 Mapledell Street (Count 13)</u>:  Bergdoll performed renovations totaling at least $1,787.59, plus labor.  (Receipts supporting this figure are attached as Exhibit T.)

      iv. <u>34 Cambridge Street (Count 29)</u>: Bergdoll performed renovations totaling at least $11,252.55, plus labor.  (Receipts supporting this figure are attached as Exhibit U)

      v. <u>21-27 Putnam Street (Count 32)</u>: Bergdoll performed renovations totaling at least $2,262.92, plus labor.  (Receipts supporting this figure are attached as Exhibit V.)

Based on the foregoing, the amount of the loss should be recalculated.  According to the Court's Order, the amount of the loss is determined by taking the amount of the fraudulent loans and subtracting the amount that the defendants paid for the property.  In addition, Bergdoll maintains that the amount he spent for renovations should be subtracted from the loss amount because the cost of the renovations improved the value of the property, thus reducing any associated loss.

Thus, the total loss attributed to Bergdoll's conduct is $952,501.85, not $1,352,238, the figure calculated by the Government.[3]  Because this figure is more than $400,000 but less than $1,000,0000, Bergdoll's base offense level should be increased by 14 points rather than by 16 points as calculated by the Government.  U.S.S.G. section 2B1.1(b)(H)

### 2.    The History and Characteristics of the Defendant

Bergdoll's personal and professional background is set out in the sections above. Based on those facts, the following issues are relevant to sentencing.

      (a) <u>Bergdoll Construction will Cease to Exist and its Employees Will Lose Their Jobs If Bergdoll Is Sent To Prison</u>

---

[3] This figure is based on the following calculation.  The Amount of Loss as determined by the Government ($1,352,238) - the value of the property that Bergdoll did not own or sell ($377,749) - the cost of renovations performed by Bergdoll ($21,987.15).  $1,352,238 - $377,749 - 21,987.15 = $952,501.85

Where imprisonment would impose a substantial hardship on defendant's employees, a downward departure below the advisory guideline range is justified. <u>United States v. Olbres</u>, 99 F.3d 289 (1st Cir. 1996) (in pre-<u>Booker</u> sentencing, court imposed non-guidelines sentence where defendant's imprisonment would have forced his business to close, causing employees to lose their jobs); <u>United States v. Milikowsky</u>, 65 F.3d 4 (2nd Cir. 1995) (upholding downward departure where defendant was only person with "knowledge, skill experience and relationships" to run his business and imprisoning him would have a devastating impact on his employees); <u>United States v. Toback</u>, 2005 U.S. Dist. Lexis 6778 (S.D.N.Y. 2005) (in post-<u>Booker</u> sentence, court departed downward from 10-16 months to one day in prison and three years supervised release where defendant was sole owner and operator of a business that employed 80 people that would be devastated without his presence).

A sentence below the advisory guidelines range is reasonable in this case based on the extraordinary harm to Bergdoll's employees. If Bergdoll is incarcerated, he will be unable to operate Bergdoll Construction and it will have to cease doing business leaving those who work for him without a job and unable to support themselves or their families. As set forth in the letters at Exhibits C, D and E continued daily involvement in Bergdoll Construction is critical to the company's continued existence. Based on the extraordinary collateral consequences to innocent third parties if Bergdoll is sent to prison, a sentence below the advisory guideline range is reasonable.

(b)  <u>Personal History and Family Circumstances</u>

A defendant's personal history and characteristics are relevant at sentencing. With respect to Bergdoll, the Court should consider his extraordinary service to the

Springfield community, his health and his inability to read and write.  With respect to

Bergdoll's community involvement, even in a pre-Booker sentencing framework, courts

would grant a downward departure for extraordinary community service by a defendant.

See United States v. Wood, 159 F.3d 1132, 1136 (8th Cir. 1998) (granting a one level

downward departure where defendant brought two troubled young women into her own

and paid for their high school education and where she assisted an elderly friend so that

he did not have to live in a nursing home).

### 3.    The Need for the Sentence to Deter Others

The court can impose a sentence that is sufficient to deter others, and that avoids

the devastating harm to Bergdoll's employees, considers Bergdoll's health and his

extraordinary contributions to his community.

### 4.    The Need to Protect the Public From This Defendant's Future Criminal Activity

There is nothing in Bergdoll's history that indicates that he will be a danger to the

public or engage in criminal conduct in the future.

### 5.    The Kinds of Sentences Available

An appropriate sentence would include 12 months of community confinement,  12

months of home confinement, a requirement that Bergdoll perform a predetermined

number of hours of charitable work, a fine and restitution.  The charitable work could

include the donation of construction services under the direction of the probation

department.  This combination will permit Bergdoll to continue to manage the daily

operations of Bergdoll Construction thus preserving employment for many people, allow

him to continue his extraordinary service to the community (in addition to the community

service imposed in connection with this sentence) and allow him to maintain a lifestyle that keeps his Chron's disease in remission.

**6.      The Guideline Range**

The appropriate advisory guideline range is 20.

**7.      The Need to Avoid Sentencing Disparity**

The drafters of the Guidelines recognized that different sentences based upon "differences among offenses or offenders" were justified.  See United States v. Jaber, 362 F.Supp. 2d 365, 367 (D. Mass. 2005) citing the Sentencing Reform Act, S.Rep. No. 98-225 at 38 (1984) reprinted in 1984 U.S.C.C.A.N.3183, 3221-29.  Thus, this Court can impose a sentence that is disparate from other defendants convicted of the same conduct because of the particular circumstances of this case, specifically the history and characteristics of the defendant and the effect of imprisonment on Bergdoll's business,

**IV.      PROPOSED STATEMENT OF REASONS PURSUANT TO**

**18 U.S.C. SECTION 3553(c)**

A sentence below the advisory guideline range is reasonable and is supported by:

(A) the nature and circumstances of the offense;

(B) the history and characteristics of the defendant including the extraordinary collateral consequences to his business if he is incarcerated; his medical needs that will not be met properly in jail and his generous community involvement.

## V. <u>CONCLUSION</u>

For the reasons set forth above, Bergdoll requests that this Court grant his request for a sentence below the advisory guideline range, imposing a sentence of probation with community confinement, home confinement, community service, restitution and a fine.

Respectfully Submitted,
MICHAEL BERGDOLL
by his attorney,

/s/ Thomas J. Butters_____
Thomas J. Butters
BBO# 068260
Meaghan E. Barrett
BBO# 054980
Butters Brazilian LLP
One Exeter Plaza
Boston, Massachusetts 02116
617.367.2600

Dated: January 16, 2007

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

/s/ Thomas J. Butters
Thomas J. Butters